IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs June 20, 2006

## STATE OF TENNESSEE v. LONNA K. BREWER

**Direct Appeal from the Circuit Court for Williamson County**
**No. II-5214   R.E. Lee Davies, Judge**

---

**No. M2005-01876-CCA-R3-CD - Filed August 3, 2006**

---

The appellant, Lonna K. Brewer, pled nolo contendere in the Williamson County Circuit Court to two counts of obtaining a controlled substance by fraud, a Class D felony.  She received concurrent two-year sentences to be served as one day in jail and the remainder on supervised probation.  On appeal, she contends that the trial court erred by denying her request for judicial diversion. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which DAVID G. HAYES and THOMAS T. WOODALL, JJ., joined.

Susan V. Logan, Franklin, Tennessee, for the appellant, Lonna K. Brewer.

Paul G. Summers, Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Ronald L. Davis, District Attorney General; and Kim R. Helper, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

### I.  Factual Background

At the appellant's guilty plea hearing, the State presented the following factual account of the crimes: On September 5, 2002, a pharmacist and a pharmacist technician from Eckerd's Pharmacy contacted the police about a forged prescription.  Detective Andrew Green of the Franklin Police Department investigated the case and learned that the appellant's doctor had given her three prescriptions for Adderall.  Although the doctor had post-dated the prescriptions, the appellant had changed the date on one of the prescriptions to August 28, 2002, and attempted to have it filled.  In the course of his investigation, Detective Green also discovered that the appellant had previously

obtained Adderall by changing the date on a second prescription from September 26, 2002, to July 26, 2002. Pursuant to the plea agreement, the trial court sentenced the appellant to concurrent sentences of two years for each conviction with the manner of service to be determined after a sentencing hearing.

At the sentencing hearing, Detective Green testified that he responded to a report of a forged prescription at the Eckerd's Pharmacy. When he arrived, two patrolmen were talking with the appellant. Detective Green went inside and spoke with the pharmacist and the pharmacist technician, and they gave him two suspicious prescriptions. Detective Green went outside and spoke with the appellant, who was "frazzled" and had a difficult time focusing. The appellant went with the officers to the police department, and Detective Green interviewed her. Detective Green stated that one of the appellant's prescriptions had been written for "9-26-02" but that the "9" had been "whited out" and changed to a "7." A sticker on the back of the prescription showed that the pharmacy filled the prescription on August 9, 2002. The second prescription, which the appellant attempted to have filled on September 5, 2002, was dated "8/28/02" and had been photocopied and "traced over to make it heavier and dark to make it appear as if it were filled out." The appellant denied tracing over or altering the prescriptions. Detective Green asked her, "[W]ell how do you explain then that this has been traced over?" and the appellant stated, "[W]ell, that's the way I was given the prescription." The appellant told Detective Green that her doctor had given her three post-dated Adderall prescriptions because he sympathized with her about her recent divorce and financial situation. Detective Green did not arrest the appellant at that time.

Detective Green testified that the appellant's physician was Dr. Lucas Van Ordin and that he spoke with Dr. Ordin's office manager, who faxed him a copy of one of the appellant's unaltered prescriptions. The unaltered prescription showed that Dr. Van Ordin wrote the appellant an Adderall prescription for "9/26/02." Dr. Ordin also faxed a letter to Detective Green stating that he did not authorize the appellant to change the "9" to a "7."

In May 2003, a grand jury indicted the appellant for two counts of obtaining a controlled substance by fraud, and Detective Green went to her home on May 16, 2003, to arrest her. Detective Green arrived about 8:00 p.m. and knocked on the door. The appellant answered the door several minutes later, and Detective Green told her that he had a capias for her arrest. The appellant told Detective Green that she remembered speaking with him at the police department but that she had no idea what he was talking about. The appellant also told Detective Green that he "would have to come back because that was not a good time for her, and that she would let me know when an appropriate time to serve that was." Detective Green told the appellant that she would have to come with him, and the appellant was very flustered and agitated. Detective Green went into the appellant's home and saw that the house was in disarray. He smelled pet urine and feces, saw that patches of the carpet were ripped, and saw that the house "looked like a tornado had gone through it." The appellant told Detective Green that she was home alone, and Detective Green took her into custody.

On cross-examination, Detective Green testified that when he questioned the appellant at the pharmacy, her answers were evasive, but she did not try to flee. The appellant did not want to talk with him about the forged prescriptions but tried to talk with him about being treated for depression and "various different things due to her divorce." When Detective Green went to the appellant's home on May 16, he saw only the lower floors of her home. Detective Green remembered that boxes were in the home, but he did not remember the appellant's telling him that she was in the process of moving.

David Pratt of the Tennessee Board of Probation and Parole testified that he prepared the appellant's presentence report. Pratt met with the appellant on the day of her guilty pleas, and he later interviewed her for about thirty minutes in his office. The appellant was pleasant and polite but "[i]t was difficult to get information out of her because she kept going off on tangents and it was hard to keep her focused." At that time, the fifty-one-year-old appellant was involved in a child custody battle with her ex-husband, and she wanted to talk about the custody dispute. On cross-examination, Pratt testified that the appellant had been a housewife for many years, had three minor children, and had no prior criminal record.

Robert Grimes, the appellant's brother, testified for the appellant that he and the appellant had a close relationship while growing up. The appellant was a good student, was senior class president, and never got into trouble. He stated that he would trust the appellant with his life and that she made sure her children did their school work. The appellant and her children currently lived with Grimes. He stated that before her divorce, the appellant kept up her house. At the time of her arrest, the appellant was in the process of moving and was replacing the carpet in order to sell the home. Grimes acknowledged that the appellant was emotionally and psychologically affected by her divorce but stated that she was a strong person. He did not believe she would do well in confinement and stated that confinement would devastate her minor children, who were sixteen, fourteen, and nine years old.

Alexandra Brewer, the appellant's sixteen-year-old daughter, testified that she and the appellant had a close relationship and that she had never seen the appellant use drugs. She also said that she had never seen the appellant "high" and did not believe the appellant was a drug addict. Alexandra was asleep at the time of her mother's arrest on May 16 and was shocked by the arrest. She said that she was a member of her school marching band, the color guard, the German club, and was a youth legislator and that the appellant was supportive of her extracurricular activities. She stated that her grades were all As and Bs and acknowledged that her mother helped her with her homework when she needed it. In 2002, Alexandra participated in a poetry competition in Washington, D.C. and a modeling competition in California, and the appellant went with her on both trips. She acknowledged that the appellant could follow the terms of probation and that the appellant had many talents and skills to offer the community.

The appellant testified that at the time of the crimes, she was divorced with four children and had never even had a speeding ticket. The appellant never got into trouble in school and graduated

from Eastern Michigan University in 1975 with a double major in psychology and English literature.[1] After graduation, the appellant worked for ten years but stopped working in order to take care of her young children. In the summer of 2002, the appellant was under a physician's care and was being treated for attention deficit hyperactivity disorder (ADHD). She had scattered thoughts and trouble focusing, and Dr. Van Ordin prescribed Adderall. The appellant had also gone through a difficult divorce after having been married for eighteen years.

The appellant testified that when Detective Green came to her home on May 16, she was asleep, had never been arrested before, and "had no idea how things like that worked." The appellant stated that in her presentence report, she described her health as "poor." However, when she did so, she had recently been released from the hospital and was in poor health. Since that time, however, the appellant had "done pretty good" and was no longer taking Adderall. Although the appellant had been having seizure-type convulsions, doctors discovered that stress was causing the convulsions and prescribed Depakote. The appellant stated that she was no longer taking Depakote but that she currently was taking Tramadol, which was listed incorrectly as Trazodone in her presentence report. She said that she had been drug-tested, had seen a psychologist and a psychiatrist, and had been assessed by Cumberland Heights Treatment Center. According to a letter from Cumberland Heights introduced into evidence, the appellant has "a low probability for a substance dependence disorder." The defense also introduced into evidence several letters written by the appellant's family and friends on her behalf.

On cross-examination, the State asked the appellant if she had altered the prescriptions at issue, and the appellant stated, "I'm taking responsibility for the action." The appellant acknowledged that on December 8, 2004, she filed a petition to change her guilty pleas to not guilty and stated in the petition, "I did not commit either of these crimes." The following exchange then occurred:

> Q.    But you are now saying that you did commit the crimes; is that correct?
>
> A.    To the best of my knowledge when I read up on this, altering [a] prescription can mean writing on it or -- it does not mean that you actually changed the dose. If you have wrote on it -- if you did anything, like doodling on it, that is altering the doctor's prescription.
>
> . . . .
>
> Q.    But are you saying that you did not change the date on any of those prescriptions?

---

[1]We note that according to the appellant's presentence report, she graduated in 1974.

A.     I am taking responsibility --

THE COURT:  Oh, I think you need to just belly up to the bar and answer the question.

THE WITNESS: I didn't change the date.

THE COURT: You didn't -- did you change anything on those prescriptions?

THE WITNESS: I wrote over them.

THE COURT: That's not changing the prescription, if you just traced over what is already there.

THE WITNESS: Well, I pled no contest and I'm taking responsibility for doing so, so I believe I need to say yes.  Is that correct?

THE COURT: Well, I just have a hard time understanding what you did.

THE WITNESS: I do too.

The appellant then stated that she believed someone in her family took the first prescription out of her purse, changed the "9" to a "7," had the prescription filled, and kept the Adderall.  Regarding the second prescription that appeared to have been photocopied, the appellant stated, "I wrote over the one.  I was waiting in line and I went over that and I told Detective Green that.  I traced over what he had already written.  I added my birthdate and I wrote in the corner, no address."

According to the appellant's presentence report, she graduated from Eastern Michigan University.  She was divorced but had four children, and the oldest child was serving in the United States Navy.  In the report, the appellant described her physical condition as poor, stating that she suffered from seizure/convulsive disorder.  The report shows that she was taking the medications Trazodone, an antidepressant; Depakote, for bipolar disorder; and Diazepam, a sedative.  According to the report, the appellant provided copies of her medical records to verify her health information. The appellant reported no drug or alcohol abuse.  At the time of the report, the appellant had custody of her three minor children and was supposed to receive $3,200 per month in alimony and child support.  However, she stated in the report that her ex-husband was "in contempt of the divorce decree."

In denying the appellant's request for judicial diversion, the trial court stated that "I just have a reluctance to do that.  A lot of it has to do with the failure, your failure to come clean with me and

-5-

tell me what exactly is going on here." The trial court noted that the appellant had been going through a divorce at the time of the crimes and that this could have been a very stressful time for her. The trial court also stated that it did not believe the appellant had a drug problem and was taking into consideration the fact that her family was present at the sentencing hearing. However, the trial court stated that it wanted the appellant's children to understand "that there are consequences for your actions." Although the trial court denied her request for judicial diversion, it concluded that the appellant was a good candidate for alternative sentencing and ordered that she serve one day in confinement and the remainder of her sentence on supervised probation. The trial court also ordered the appellant to maintain part-time employment.

## II. Analysis

The appellant claims that the trial court erred by denying her request for judicial diversion. She contends that although the trial court denied diversion on the basis that she did not admit her guilt, the legislature did not intend to exclude people who do not expressly confess their crimes from receiving judicial diversion. In support of her argument, she notes that the judicial diversion statute specifically states that defendants who enter nolo contendere pleas are eligible for diversion. The appellant also contends that the trial court failed to sufficiently state on the record its reasons for denying diversion and that diversion was appropriate in this case because she did not have a sustained intent to violate the law, has a favorable social history, is a community volunteer, is a college graduate, obtained the Adderall prescriptions legally, and has no prior criminal history. The State claims that although the appellant qualified for judicial diversion, the appellant's lack of candor alone was a sufficient reason to deny her request. We conclude that the trial court properly denied judicial diversion in this case.

A defendant is eligible for judicial diversion when he or she is found guilty or pleads guilty or nolo contendere to a Class C, D, or E felony and has not previously been convicted of a felony or a Class A misdemeanor. See Tenn. Code Ann. § 40-35-313(a)(1)(B). It is within the trial court's discretion to grant or deny judicial diversion. See State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). As such, the trial court's decision will be overturned only if the court abused its discretion. Id. In other words, we will not interfere with the denial of judicial diversion if the record contains any substantial evidence to support the trial court's refusal to grant diversion. Id. Moreover, we observe that "judicial diversion is similar in purpose to pretrial diversion and is to be imposed within the discretion of the trial court subject only to the same constraints applicable to prosecutors in applying pretrial diversion under [Tennessee Code Annotated section] 40-15-105." State v. Anderson, 857 S.W.2d 571, 572 (Tenn. Crim. App. 1992).

In determining whether to grant a defendant judicial diversion, the trial court must consider all of the following factors: (1) the defendant's amenability to correction, (2) the circumstances of the offense, (3) the defendant's criminal record, (4) the defendant's social history, (5) the status of the defendant's physical and mental health, and (6) the deterrence value to the defendant and others. State v. Lewis, 978 S.W.2d 558, 566 (Tenn. Crim. App. 1997). "The trial court should also consider whether judicial diversion will serve the ends of justice--the interests of the public as well as the

accused." Id. The record must reflect that the trial court has taken all of the factors into consideration. State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998). Furthermore, "[t]he court must explain on the record why the defendant does not qualify under its analysis, and if the court has based its determination on only some of the factors, it must explain why these factors outweigh the others." Id.

Upon our review of the record, we believe the trial court properly denied diversion in this case. The appellant's lack of a criminal history, family support, and care of her minor children weigh in favor of granting diversion. However, the appellant not only refused to accept responsibility for her crimes but tried to shift blame to another member of her family. In State v. Anderson, 857 S.W.2d 571, 574 (Tenn. Crim. App. 1992), this court stated,

> the record reflects that the trial court did not consider the defendant sincere in accepting responsibility for the offense and it was duly concerned with the defendant's attempt to divert the blame to another. These circumstances are relevant to assessing the degree of rehabilitation potential shown by the defendant. Since the trial court was in the best position to determine [the defendant's] attitude and demeanor, we are not in a position to view the defendant differently upon the record before us.

In the instant case, the appellant's failure to accept responsibility for her crimes greatly disturbed the trial court. The appellant's failure to accept responsibility and her attempt to shift blame reflects poorly on her rehabilitation potential, and the trial court obviously gave great weight to this factor. Nevertheless, we recognize that a defendant's "continued denial of guilt should not, in and of itself, preclude judicial diversion." State v. Lewis, 978 S.W.2d 558, 567 (Tenn. Crim. App. 1997). However, the trial court's statement that the appellant failed to "really come clean with me and tell me what is exactly is going on here" demonstrates that the trial court also believed the appellant was refusing to testify truthfully and lacked credibility. Moreover, the trial court's stating that it wanted the appellant's children to understand there were consequences for her actions demonstrates that the trial court believed the deterrence value to the appellant and others was an important sentencing factor in this case. From the record before us, we cannot conclude that the trial court abused its discretion by denying diversion.

### III. Conclusion

Based upon the record and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE